Case number 14-1016, Hermes Consolidated, LLC, doing business as Wyoming Refining Company Petitioner versus Environmental Protection Agency. Mr. Miller for the petitioner, Mr. Heminger for the respondent. Thank you. Mr. Court, my name is Eric Miller and I represent Wyoming Refining Company. In denying Wyoming's petition for hardship relief from the Renewable Fuel Standards, the EPA made an unexplained and highly significant change in its approach to evaluating hardship. And that change violates the EPA for two distinct reasons. The first is that, as we didn't know when we filed the petition for review but has now become apparent in the course of the briefing, that change was made in the middle of EPA's evaluation of applications for hardship relief for the 2013 compliance year. That is, before EPA decided this case, it had decided the cases of other 2013 applicants, and apparently it applied the old methodology to those applicants. So what we have here is a case of failing to treat like applicants like. I'm sorry, I didn't follow the introductory clauses. You didn't know it at what time? The decisions on hardship petitions are not generally public. So what we did not know, when we got the order in this case, it said we're applying this new methodology. What EPA said in its brief is that that change in methodology was made in the course of this petition, not at the beginning of the year, but it was made, the change was made when they got to Wyoming's petition. So the petitions that EPA had evaluated before, which, again, were for the same 2013 compliance year, the earlier evaluated petitions, it now appears, were evaluated. Is this an argument you need to make before the agency first? This is an argument that the agency hasn't been able to respond to because it's not made until afterward? It's an argument that we had no way of making before. I understand, but does that mean that you need to make it with them after you discover the information? Well, I think that there's some question as to whether the agency could articulate any justification for treating essentially identically situated petitioners alike, but I think at a bare minimum that by itself would require a vacatur. Just to be clear, the particular change you're talking about is the addition of the intermediate category of five, the intermediate value of five, as opposed to just the Boolean variable, zero to ten, on the one of the three viability criteria? Yes, Your Honor. Well, they introduced an intermediate value on two of them. But the one you care about. But the one that's relevant here, yes. And why is the relevant baseline for purposes of determining whether entities are similarly situated in service of the principle that you articulate? Why is the relevant baseline 2013 applications? Because what they're seeking is exactly the same thing. So the petitions are evaluated for particular compliance years, and so you have people in the same industry, in the same buying and selling rims, in the same market, and at the same time. And the question is, can EPA articulate some justification for treating people differently just based on the happenstance of when it gets around? I guess my question is, suppose that they changed at the beginning of 2013, then would somebody not be making an argument that, well, similarly situated entities are still being treated differently because all the entities that applied last year are similarly situated for purposes of whether they should get the exemption? Well, they're getting different exemptions then. I mean, an exemption for 2012 is, I think, relevantly different from an exemption for 2013 because it means that you're buying or selling rims at a different time, and you're not directly competing against somebody in that same time. Now, if they had made the change... So is there direct competition in the... Wouldn't that be true at the beginning of the year and the end of the year? I think not in... I think it's much more attenuated. And certainly it is the case that an agency can change course over time, and I suppose in some sense that you always have the earlier people are different. But what makes this unusual is that they are at a different time only in the sense that the agency is processing them at a different time. Are there other direct competitors who got exemptions? I mean, we don't know exactly who got exemptions because they aren't public. And so I don't want to suggest that they're direct competitors in the sense that they're in the same geographic area, but other small refiners in the United States... Why would that... Assume just for the purpose of the argument that there were other parts of the United States but not competitors, weren't selling to the same companies or anything, so that their cost structure is kind of irrelevant to their ability to compete. Why does it matter? I understand why it might not be fair, but I'm not following exactly why that should matter for purposes of our consideration if they're not competing with each other. Because the question for the court is, has the agency articulated some reason for treating similarly situated parties differently? Well, if they're not competitors at all, then why aren't they in the same category as the question that Judge Srinivasan asked, which is why isn't the question any different than why did they change from year to year versus why did they change to mid-year, if in fact they're not competitors of each other? Because, again, what they are seeking is the same thing at essentially the same time, and the only difference is when EPA happened to process them. But it might be helpful to move to our second point, which is that even setting aside the change in the middle of the year, this was a highly significant policy change that under State Farm, EPA had an obligation to explain. And I think to appreciate the significance of it, you have to look at this variable in the context of ______. You don't think it was explained? I thought you were. I mean, EPA says that it's a more refined metric. It was used for other indicators, and we're using it here because it's more refined. It gives us a better, more precise evaluation. What more did they need to say? Your Honor, the fact that it is more refined and that you have three rather than two is essentially tautological. They're saying we wanted to have three because three is more than two, and the question is when you look at how this works in terms of the real world of evaluating applications, you have three components of the viability scoring. The one we're talking about is compliance costs eliminating sufficiency gains. The other two are individual special events and compliance costs likely to lead to shutdown. Individual special events are things like a natural disaster or an accident by definition. They're quite rare. Compliance costs likely to lead to shutdown is also an extreme event. So in the run of cases, the most generally applicable one is compliance costs eliminates sufficiency gains. And under the old system, if you could show some effect on efficiency, that would be enough to get a 10, and that would be enough that you would qualify. Now they have created a system that is ______. How do you know that? Because I guess what confused me about this argument is that if it were true that any effect would be enough to get you a 10 and it's only no effect that gets you a 0, then the addition of the 5 can only hurt as a mathematical proposition. But why do we think that any effect at all necessarily gets a 10? Because I read the materials to suggest that it's a qualitative assessment and you have to look to see whether the effect is significant enough that it's going to have some long-term implications. So it's not just any effect that would necessarily bump it up to a 10. All I can point you to is the way that the EPA described it in this order at page 330 of the Joint Appendix where they said that 0 is no impact on efficiency, not small impact on efficiency, but 0 is no impact on efficiency, 10 is impact on efficiency, and then they've added in the middle 5, moderate impact. And I would add that they have not offered any definition of what a moderate impact is. We know that whatever Wyoming had apparently isn't enough to be more than moderate, but we don't know why. They've replaced the objective test of is there an impact or is there not with the subjective inquiry into whether your effect is moderate. But I think the very fact that the range used to be no on one end, impact on the other end, and then moderate stuck in the middle, and nobody's suggesting that sticking moderate in the middle is nonsensical because moderate necessarily is greater than impact. Because you could say moderate actually is greater than 10 because 10 would be any infinitesimal impact. So now we know that there's a 5 in between the 0 and the 10, so that's moderate. And if that's true, then it makes sense to have a level of moderation between no and impact. And it doesn't seem like we know that moderate will necessarily make you worse off because moderate was always there as a possibility in between the two poles. Does that make sense? Yes, Your Honor. But the reason that we know that it will make applicants worse off is by looking at what happened to Wyoming in the prior years. Wyoming was scored a 10 in prior years, and the agency said you've shown an impact on efficiency, therefore you get a 10. They didn't say you've shown an impact on efficiency that is greater than some threshold. As to that, I thought the agency did say, even back in the prior regime, the pristine regime where it was 0 and 10, that it's likely in future years that this variable is going to change precisely because you've gotten the exemption before. And so you're going to be better situated to achieve compliance costs. I thought they actually spelled out that explanation even before. They made a factual prediction that refiners who had received an exemption might be able to make investments and therefore would not suffer hardship in the future. But at the same time, they also made a prediction that if the RIN market were to change such that the cost of RINs exceeded the cost of lending, then there would be a significant hardship for small refiners. The EPA recognized that in 2010, and DOE and the Small Refinery Exemption Study recognized that. And having recognized that back then, we are now in a situation where that prediction came to pass, and the cost of RINs has gone up, and you have a refinery who was not able to make, did make some investments in blending, but did not and cannot make investments to allow it fully to comply through blending. So what I would say is that that part of the factual prediction is demonstrably at odds with reality. The other factual prediction about what would happen, what the consequence of dysfunction in the RIN market would be, has come to pass, and the agency has abruptly changed course from what it had said it would do back then. In 2010, EPA said, we're putting the compliance obligation on refiners, and we recognize that some of them can't actually comply by blending, but it's okay because they'll be able to buy RINs, and if that turns out not to work, we'll revisit this issue. And now we are in a situation where that, in fact, has turned out not to work for refiners like Wyoming that can't do sufficient blending to comply, and they are suffering disproportionate hardship. And EPA, instead of granting that to them as they had suggested they would, has changed the scoring methodology in a way that, you know, I think EPA even recognizes that this change makes relief more difficult to obtain, even if, you know, looking at it in the abstract, you might not conclude that, but that does seem to be the way that they're applying it. If there are no further questions, I'll reserve the remainder of my time. Oh, I actually do have another question. On page 53 of your brief, and I'm going to refer to the sealed one in order to get around the problem of revealing what's in the sealed one, you have a, this has to do with the error in the calculation of net income? Yes. On page 53, about 1, 2, 3, 4, 5, 6, 7, 8 down, you say EPA should have subtracted the blank amount, which would have yielded a net income of just blank. Yes. In your reply brief at page 34, in the first full paragraph, 1, 2, 3, 4, 5 paragraphs down, you have a different number. Those figures should be adjusted by blank to blank, and it's the second blank. Right. It's a considerably different number than the number in your opening brief. That is a different net income number. Yes, it is. Yeah. But why? I don't know. I mean, is something else going into that? You can think about it and come back. I will think about that. Okay. Thank you. Good catch. Chief Judge Garland, may it please the Court, Justin Heminger from the Department of Justice on behalf of EPA, with me here at the Council table is Susan Staley from EPA's Office of General Counsel. I wanted to address the questions that the Court has raised and that my Underfinance Counsel, Mr. Miller, was raising about DOE's change in the scoring matrix, particularly the metric 3A, which is in the viability index. And Mr. Miller had raised two different points, the first being that DOE made the change in the middle of 2013, and the second being that that change is simply unexplained. And on the first point, DOE actually applied the intermediate score to all petitions for hardship relief from the 2013 Renewable Fuel Standards. So it's not, in fact, the case that DOE was applying a different standard to parties that were seeking hardship relief from the 2013 Renewable Fuel Standards. Our brief, you know, maybe it could have been worded differently to make that clear, but that's just not a correct interpretation. When you say the brief could have been worded differently, I mean, was it in the brief at all? Regardless of how we worded it, my Underfinance point that we had applied a different standard is simply not accurate. So if you look at the nature of the— How would we know that from the record? That's a good question, Judge Tatel. I'm not sure that it comes across in the record. If you look at the May 2014 addenda that DOE issued, and we're not relying on that because it's not in the record, but if we look at that, DOE itself says that it was applying an intermediate score to 2013 hardship petitions. Where did they—I probably should have asked this question. Where did your opponents get the idea that it was done in the middle of the application period? It's from page 50— Excuse me. It's on page 53 of our brief, I believe. I have the page number here. Page 49. 49 of our brief, Your Honor. And what was the language? The language they're quoting is in the middle of that last paragraph, in evaluating Wyoming Underfining's hardship petition, DOE modified two of the metrics. I see. So— That's not— You're not saying that you didn't do that for everybody. You're just saying for everybody in 2013. That was the meaning of this sentence was that— So the only question is what you actually meant in the grammar of that sentence. That's correct, Judge. And you're representing that you did not mean it was mid-intermediate race. It was from the beginning of that year. That was not the author of the brief. Got it. Okay, thank you. When was the—when did it change the liabilities for— Well, Judge Segal, as Mr. Miller pointed out, there's a little bit of difficulty here because all small refineries that submit these petitions claim CDI for their financial information, so they're not published. But the change, my understanding is that—I'm not sure if it was applied before 2013, but for 2013, for all hardship petitions, which can be submitted at any time— I understand. Okay. Go ahead. Can I ask you this question? I'm sorry. No, I'm done. Can I ask you this question? So that there's a representation, as I understood on the other side, that EPA agrees that the change only made applicants worse off. Do you agree with that? I'm not sure that we've conceded that. And I think if—you know, one way is to look at the— Maybe you haven't before, but what's your view about that now? Is it true that by adding the 5, it necessarily made all applicants for exemptions worse off? Well, I think, Judge Schenross, as you pointed out, I mean, it's imprecise in the sense that you have a 0 and a 10, and the way that that's defined in the actual—the visual table makes it look as if a 10 means any impact, and I think the problem with that is that Department of Energy and EPA have looked at viability. They looked at this statutory standard, disproportionate economic hardship, as requiring something more than an economic impact or effect. And I'd point the Court to Joint Appendix 321, and that's from DOE's original 2011 study, where DOE says that disproportionate economic hardship requires two things. It requires both a high cost of compliance relative to the industry average, but it also requires, and Judge Schenross, and this is what you were pointing out, in effect sufficient to cause a significant impairment of the refinery operations. And I think what this metric 3A is getting at is it has to be a hardship. It has to be a real effect that is sufficient to constitute a hardship, not just an impact. Right, and so— And so—sorry. Am I right to think that there's also JA-59? I think that's from the same study, the same—yes. And it's explaining this criteria in the old regime where it was a 0 and a 10 and no 5 in between, and it speaks in terms of whether there would be a reduction of profitability enough to impair future efficiency improvements. And then while it would not lead to immediate shutdown, significant constraints on improvements would eventually leave many small refineries at risk, which would lead me to think that it's not any impact, it's a significant impact or something that's more than any impact at all. That's correct. I think both agencies have viewed it that way consistently, and when you get to the change in the metric, it's simply a refinement that further, you know, sort of further refines the way that the agency is expressing that metric. Now, in terms of the change in policy that Mr. Miller pointed to, as Judge Tatel pointed out, there is an explanation in the EPA's decision, and that's at Joint Appendix 321 in footnote 4. And we think, although it could have been more fulsome, it meets sort of the Fox television standard. It both acknowledges that the agency is making a change and it offers a reason. Mr. Miller described that as tautological, but greater accuracy is a rational reason for a change. So we think that it meets, you know, 706 standards. Can I ask you a question about something that Chief Judge Garland raised at the end, which is this net income argument that's been made? And that is this, that you don't deny that the net income figure that's cited in the EPA's decision is off by a significant factor. And I think this is in the public briefing, so I'll just say it's off by a factor of 71%. That's correct. And then the decision, and you quote this in the public brief, so again I'll quote it, is that the decision that EPA issued relies on the fact that the net income is, quote, significantly greater than the projected 2013 purchase rent cost. So it's significantly greater. So if it's off by 73% and EPA relied on the fact that it's significantly greater, if you reduce it by the requisite amount, how can we be sure that it's still significantly greater? Well, this goes to our harmless error argument, and, you know, I think the question, there is a delta, and I think you have to look at that delta. And this figure is in the sealed brief, but if you look at Joint Appendix 331, which is where we identify, excuse me, 331, where we identify the rent compliance cost that would be estimated for the worldwide rent refining, that's in the middle paragraph. If we compare that cost to the correct net income figure, you know, I think that's still EPA's conclusion that those numbers, there's still a significant delta between those numbers. So let me ask you this. Yes. If the error were off by enough that the net income were still greater than the rent cost, but by a dollar, would you be saying the same thing, that it's harmless error? I hope not, Your Honor. You wouldn't be. So in other words, so we have to conclude that it's still significantly greater. Well, I think here it is, but I think what we've also pointed out is that, you know, most of the figures that EPA is relying on here are accurate. And if you look at, Wyoming Refining said that EPA could not consider net income. We disagree with that. But regardless, Wyoming Refining said in sort of advocating for the agency, EPA, the proper way to look at a refinery's health is a particular measurement called Earnings Before Interest Taxes Depreciation and Amortization, EBITDA, and that that's the figure you should look at. And the figure that EPA used in its decision for the EBITDA figure was the one that Wyoming Refining put forward in an October of 2013 supplement. And that figure is correct. And if we look at the delta there, and this is on Joint Appendix 332, if we look at the delta between the EBITDA number that's listed there and then the compliance cost estimated on Joint Appendix 331, again, you still have that significant delta between the two numbers. Right. So there's other places that didn't change. So I'm focused on this one sentence, the significantly greater sentence on 331, that uses net income rather than EBITDA. And I guess you could make two arguments, two harmless error arguments about the sentence, one of which would be this sentence actually doesn't matter because there's other stuff that we've done that shows that we've read the same decision, which is how I understand your EBITDA argument, which is to say there's other figures that show that there was maybe a delta in different dimensions and that was more than ample. So the other harmless error argument you can make is, even taken on its terms, this sentence alone is still significantly greater. That's correct. And I guess as to that one, how do we go about deciding that when it's off by a factor of 73%? We'd have to conclude that it's clear that EPA would think it's still significantly greater. Well, I think as we also pointed out in our brief, this is EPA's independent analysis of the financial information that went under Finance Submitted. But, in fact, EPA said that the primary factor that it will look at in assessing these hardship positions is the Department of Energy's assessment. So that's the EBITDA argument because that's also saying, if I'm understanding correctly, but that's also saying whatever we meant in this sentence, just disregard this sentence because there's other stuff that mattered a lot more. EBITDA, what DOE did, it's other stuff. Yes, yes, yes. And significantly greater has a subjective element to it. I think here it's not really saying that the net income is significantly greater. It's saying that Weimaraner will still remain profitable to afford compliance without significantly impacting viability. So I think that's a little bit different than saying that those numbers are significantly different. Well, it says the sentence just says significantly greater. The net income will be significantly greater than rent cost. That's just not just reading it verbatim. And I don't know, 73% difference seems, unless you're going to say that 73% is not significant. Okay. No, I understand. Yes. You know, I think I would point back to the beginning of that paragraph where EPA's ultimate conclusion is that Weimaraner finding will remain profitable. No, it says profitable enough. Profitable enough. Without significantly impacting. That's correct. And so in the very next sentence, the proof of that proposition says the operating, the net income is significantly greater. Yes. Now we know that they figured that the numbers that was based was overstated by a factor of 73%. That's correct. But the context of EPA's conclusion here also addresses Weimaraner finding's argument about the need to implement capital improvement projects. And part of that, and so EPA's ultimate conclusion that it's not going to impact our viability also is focused on responding to Weimaraner finding's point that, you know, we need to comply with this gasoline-benzene reduction standard, and we want to improve our refinery. And so part of the response here in this paragraph that EPA is, the point EPA is making is, yes, that might be true for 2013, but in 2012 you could have used some of that free cash to prepare for these major environmental compliance programs that you knew you had a deadline coming up to be, you know, to face. So I think EPA's overall conclusion that their viability was not impacted is based on this as well as DOE's independent determination that Weimaraner finding's viability didn't score high enough to meet the viability index. Yeah. I mean, I guess it's sort of like in criminal law you could say there's still evidence sufficient to sustain the conviction, but if the standard is, is it clear that this error wouldn't have changed anything, it's a little bit of a different question. I'm not saying I know the answer to that. Sure. It seems like a different question than saying there's still other stuff in there that would sustain and might well, if EPA had the correct figure, sustain the same decision. But the question for us, I think, is, is it clear that EPA would have reached the same decision, not the same error? So Weimaraner finding in their reply brief says it's a brand of airways, and I think there's a reference to a clear standard. You know, is it clear? We would point to the later in the decision where the court conducts its analysis and looks at the standard and says there's a substantial doubt standard or a materiality standard. Is this really material, and, you know, do we have a substantial doubt here? And in a closed case, yes, that might matter. I think this is not that. Can I just ask, what analysis did DOE use on this kind of analysis? Did it not do any significantly greater than analysis? I'm not sure that I understand. Well, you said it doesn't, on one reason it doesn't matter, because not only did this error was in the context of EPA's own independent analysis, and I take it from that DOE didn't make the same mistake in terms of numbers. What's the sort of analogous, if any, analysis of DOE here? Or is there nothing like that? This was one reason why EPA agreed, you know, confirmed DOE's analysis. Yes. What kind of mathematics does DOE use? I just wanted to correct one thing that you said. One of the numbers that DOE used does appear in a footnote. The average net refining margin per barrel, they include the wrong number in the same number that EPA used. Now, our point there was that you lower the number and it's still head and shoulders above the industry and everything else that both agencies said is just correct. So I wanted to correct that. But your question was what DOE did, and if we look at Joint Appendix 330, when you look at DOE's evaluation of winemaker finings, the scoring matrix, and we're looking at metric 3A, which is on Joint Appendix 330, there's a footnote there. And actually, this is a significant footnote. It's footnote 20. And here is DOE's sort of where EPA describes what DOE did to analyze winemaker finings' viability. And the point here is that I think Judge Srinivasan pointed out when DOE initially did its study, it predicted for metric 3A that refineries that scored high in this category would eventually score lower. It didn't say they would score zero. It said they would score lower. And when you look at what DOE is saying here, they're saying this is consistent, that winemaker finings saved, and I won't use the figure from the sealed brief, but they saved an EPA-estimated X dollars from getting the extension of the hardship exemption in 2011, and that that puts them in position to comply in 2013. So I would say that DOE's analysis is a little bit different than EPA's analysis of viability, but they're consistent. What you're saying is DOE doesn't do an analysis of net income or anything else for 2013? Is that what you're saying? I'm not sure whether they look at net income. Or data or anything else. Do they do anything? Well, I think EPA's explanation for what DOE did is in footnote 20, and that doesn't rely expressly on either if it does work. Working over three calendar years, footnote 20, right? The average net refining margin does for barrel, but that's metric, excuse me, it's metric 2A. Which is the sentence that you're referring to in footnote 20? This is in joint appendix 330. No, no, which sentence in note 20 do you want me to look at? The footnote is EPA's explanation for DOE's decision here on the score. But if we look at the last sentence, I think that's probably the most significant because it's DOE's conclusion that Wyoming refining's exemption for those two years from the 2011 study saved them an EPA-estimated X dollars. You're saying EPA, DOE did not look at what the consequences would be for 2013. They just looked at what they... I'm not saying there's anything wrong with that, I'm just asking. Yeah. They didn't... I don't think that's in the record. So the most explanation we have for the reason that DOE scored is there. Do we know that EPA did not look, I mean, I'm sorry, DOE. Do we know that DOE, in providing the input to EPA, that DOE did not look at net income? What we know is that in the decision itself, EPA says that it forwards Wyoming refining's financials to DOE. But I don't think we can rule out that whether in the exchange of information, you know, how that would have played out. So DOE has all of Wyoming refining's financials. Okay, further questions from the bench? Okay, thank you. Does the petitioner have any time left? We'll give you another two minutes. Thank you, Your Honor, and let me begin by addressing your question. And I want to apologize for the lack of clarity in the briefing on that. The first set of numbers... Maybe my own lack of ability to understand, not your clarity. The first set of numbers were drawn from the table on page 326 of the joint appendix, and those are actually the first half of 2013. The second set of numbers are from the discussion on page 331. When you say the second set, you mean the reply brief? The reply brief, yes. So the government acknowledged what you said in the blue brief. They agreed with that. That's what they agreed to. Yes. But now you have a different number on 34. And that comes from page 331 of the discussion that my colleague was just... the sentence that my colleague was just discussing with Judge Srinivasan. Those numbers are projections for the whole of 2013. They are not infected by the math error, but they are infected by the failure to take account of unrealized hedge gains and losses. And as the earlier colleague made clear, when you take account of those adjustments and you also look at other effects on cash flow... Is this a failure? So the math error was adding rather than subtracting. Yes. Right? That seems like a math error. Yes. That's not what we're talking about here. That affects the table on 326. It does not affect the... Okay. And so this number you have here is not a math error? This is just your argument that they should have taken this into account and didn't? If this number is the one in the narrative on 331... That's helpful, yes. Then, yes, that is a number that is an income without regard to... that has not been adjusted to take account of unrealized hedge... So when you say there, even though as it appears to recognize, meaning EPA, those figures should be adjusted to... in fact, did EPA recognize that? That's the part that I'm confused about. That was... Is this some acknowledgement by EPA? It was our understanding that they have acknowledged that it's appropriate to adjust the income figures to take account of unrealized hedge gains and losses because when you're looking at the refiner's cash position, they don't have the unrealized effects of the hedge transactions as cash. And a key part of... I'm sorry, I'm still not following. I thought that EPA had agreed that the net realized and unrealized hedge impact should be subtracted. And in that agreement, they came to the number that you started your blue brief in. Is there something else that I'm missing here? So they're discussing income in a couple of different places. In the table, which appears earlier in the JA, they have an adjusted and an unadjusted number. And they make the adjustment wrong by adding rather than subtracting. Then in the narrative on 331, they have what is a different net income number because it's a projection for the whole year, not just the first six months. And they emphasize the unadjusted number. And there we have a separate argument that what really matters is the adjusted number that is adjusted to take out the effect of unrealized hedge transactions because when you're looking at the cash position, you need to make that adjustment. And it's our understanding that they've acknowledged that the cash position is affected by the adjusted net income, not the unadjusted one. And when you take out the hedge transactions and when you take account of the other interest payments and other kinds of payments that the refinery is required to make. I'm sorry. I understand that to be your argument. I don't understand the EPA to have agreed to your argument on that. That's the only question I'm really asking. I understood their brief to acknowledge that income figures should be adjusted by unrealized hedge gains. Now you're starting to talk about additional things, interest, other things. Oh, okay. Yes, the interest is a separate argument. I'm sorry. One small question. Still, on the blue brief on 53, that number, you're saying that's not the entire year? That wasn't a projection for the year or the number that everybody agreed to? The page 53 number, that's the first six months. Only the first six months. Okay, thank you. Yes. I just want to clarify one thing. So the number that's used on JA-331 as a net, it says net income of approximately blank in 2015. Yes. I thought the math error infects that number. At least EPA thinks the math error infects that number because EPA in its brief at page 72 agrees with you based on the simple mathematical error that the correct figure is 73% different. It seems like what you were saying just now is that JA-331 is something different from the math error, but as I understand EPA's acknowledgment on page 72 of its brief, it's saying the math error is real and the math error means that the income figure on 331 is off in the way that you had said in your brief at page 53. And it's referring to projected for 2013, not just for six months. You're right, and I'm sorry for the confusion on that. Okay. Any further questions? No. Okay. Are you satisfied with the EPA's explanation of the grammar of that one? I take it your entire argument about changing in the middle of 2013 was based on your understanding of that single sentence. Is that right? Yes. And are you satisfied that that sentence can be read the way that EPA says they intended to read it? That sentence can be read that way. I mean, I do think that this highlights, or I would say the opacity of this entire process highlights that. But the only reason for reading it another way is to, with respect, to say that the person who wrote the brief is lying to us today. We certainly do not at all mean to suggest that. I didn't mean you did mean to suggest that. I just want to be clear that you're not making that. No, we are not. Fair enough. All right, we'll take the matter under submission. Thank you both very much. Thank you.
judges: Garland, Tatel, Srinivasan